### SHEPHERD v. THE ORLEANS COTTON PRESS COMPANY.

The omission to re-inscribe a mortgage on the books of the register of mortgages within ten years from the date of the first inscription, may be opposed by the parties themselves or by any third person having an adverse interest, although charged with notice. C. C. 3333. If the time be suffered to expire without a re-inscription the mortgage will lose its rank, and a subsequent re-inscription will give it effect only from the time of such re-inscription. Even the sale of the property mortgaged will not, where the purchaser fails to pay the price, dispense with the necessity of a re-inscription, which must be continued until the proceeds of the property are reduced to possession. By the omission to re-inscribe, the effect of the first inscription ceases, not the effect of the mortgage itself.

A description of the property mortgaged is essential in a re-inscription. A reference to previous mortgages will not cure the defect of a want of such a description. *Per Curiam:* The object of the re-inscription is to dispence with the necessity of searching for the evidences of mortgages more than ten years back.

A PEAL from the Fifth District Court of New Orleans, *Buchanan, J.* Several mortgage creditors have appealed from the judgment, settling the order in which the mortgage creditors of the defendant are to be paid out of the proceeds of certain property, and ordering the erasure of the other mortgages. The mortgages to be classed are as follows : 1. A mortgage to secure the payment of certain bonds, all dated the 15 March, 1834, which was inscribed on the 26th of the same month, and not re-inscribed until the 21 April, 1845. 2. A mortgage to secure the payment of certain bonds, dated 15th January, 1836, and recorded on the 30th of that month. An attempt was made by *Shepherd*, a holder of some of this series of bonds, to re-inscribe this mortgage so far as he was concerned. The following entry appears on the books of the register :

"13th January, 1846. By act before *H. B. Cenas*, notary, dated 12 Jan., 1846, *R. D. Shepherd* declared that he is the holder of 82 bonds of the Orleans Cotton Press Company, signed, &c.—and numbered &c.—each of which is for $500, more fully described in the *inscription* thereof, all of which bonds are signed "ne varietur" by said *H. B. Cenas*, notary, for the purpose of identifying the same with the act passed before the said notary on the 13th January, 1846, recorded in this office, in B. 30, F. 542, by which the Orleans Cotton Press Company granted a special mortgage in favor of the purchasers and holders of the said bonds in order to secure the payment thereof with the interest accruing thereon, subject to mortgages inscribed in B. 30, F. 542, of which this is a partial re-inscription, or B. 27, F. 215, or other mortgages which might have been recorded up to this day. The desire of said *R. D. Shepherd* is to procure a re-inscription of the aforesaid special mortgage, so far only, however, as the same relates to or affects the above described 82 bonds, in order to *interrupt according to law* the prescription that might otherwise shortly bar the same."

3. A mortgage in favor of *Leeds & Co.*, inscribed on the 29th July, 1840. 4. One given to secure certain bonds of the defendants, inscribed on the 14 December, 1841. 5. A judgment obtained by *R. D. Shepherd*, on certain bonds of the second series, against the defendants, registered 3 February, 1846.

There was judgment below ordering the proceeds of the property to be applied: 1. To pay the costs in the suit in which the property was sold and in this suit. 2. To discharge the mortgage of *Leeds & Co.* 3. To pay the balance due on the mortgage recorded on the 14 December, 1841, with interest. 4. To pay the balance due on the mortgage re-inscribed on the 21 April, 1845, with interest. 5. To pay the principal, interest and costs due on the judgment of *R. D. Shepherd*. *Bringier, Phelps, Dodge & Co.*, and *McCawley*, as tutor, appealed from this judgment, and the other creditors have prayed that it be amended.

*L. Peirce*, for *Phelps, Dodge, & Co.*, appellants. *Phelps. Dodge, & Co.* claim with others, holders of the second series, that they come next in rank to the holders of the first series, because although the first series were not re-inscribed until the expiration of the "temps utile," and admitting for the present that the re-inscription of the second series was defective, as regards all the present opposing creditors, no re-inscription was necessary to give rank to the first and second series; and that it is only "lorsque l'inscription a été nécessaire pour opérer l'hypothèque, que le renouvellement est nécessaire pour la conservation." Persil, Hypoth., sur l'article 2154, vol. 2, p. 91–2. Boileux, Hyp. p. 614.

There are two articles in the Louisiana Code, (3314 and 3315,) which are not in the French Code : "Art. 2148 of the latter has only the first sentence retained in art. 3330 ; and it is upon these differences that we base our position that, as to all parties to this suit, no inscription is necessary.

SHEPHERD
*v.*
ORLEANS
COTTON PRESS
COMPANY.

Art. 3314 says that, "mortgages are only allowed to prejudice third persons, when they have been publicly inscribed on records kept for that purpose, and in the manner hereafter described." Art. 3315 provides that: "By the word third persons used in the foregoing article, are to be understood all persons who are not parties to the act or judgment on which the mortgage is founded, and who have dealt with the debtor in ignorance or before the existence of this right." Here the contending parties cannot be called third persons, because they did not deal or become creditors before the existence of this right; and they did not deal with the debtor in ignorance of this right, as each had it re-iterated to him in writing, at the time of making the several contracts. If these mortgages had never been inscribed, the present parties not being third per-sons, could not take the unjust advantage now claimed, because their knowledge is "equipollent" to one continued inscription. This makes the difference between our law and that of France. In France, besides requiring that the party shall make an inscription, with a long list of formalities, (art. 2143, C. N.) the non-inscription and non-obedience to what they consider substantial formalities is considered fatal, and witnesses and persons having full knowledge of the in-cumbrances may take a subsequent mortgage, and by inscribing it before the prior one, in bad faith secure themselves priority. Sirey 14, 2, 62. This most unjust law has been wholly excluded from our system by art. 3315. Troplong, Hyp. § 569, p. 424, vol. 2, says that, "pard es motifs d'interêt géné-rale la loi avait exigé que l'hypothèque soit inscrite, toute hypothèque non in-scrite est reduite "ad non esse" à l'égard des tiers, soit qu'ils aient eu connais-sance de l'hypothèque, ou qu'ils aient ignoré; une circonstance particulière, telle qu'une notice extrajudiciare, ne peut pas fléchir la volonté du législateur." By our Code a notice "extrajudiciare" would not "faire fléchir la volonté du législateur," should effect be given to it; for it is expressly enacted that, it shall exclude whoever has received it, from the class of third persons. Vide Grenier, Hypoth., vol. 1, pp. 131, 125. In France, all are thirds persons but the debtor, and the mortgage has no existence, without inscription, except towards the debtor. Boileux, Com. Hyp. p. 349, vol. 2.

The mortgage there has no rank "among creditors," without inscription; and it is because the words of the law make no distinction, that "le Code Civil n'attache la publicité, et par conséquent la conservation de l'hypothèque qu'à l'inscription 'sans distinction.'" Grenier, vol. 1, p. 237 and 238, 1 partie, cap. 1, ss. 2 and 3; and see his report in note, p. 238, of the judgment of the Court of Appeals of Turin, in 1811.

All this French law is inapplicable to us—is wholly adverse to the spirit of our law—of the law of the United States and England, where extrajudicial notice is always, when brought home, equipollent to the recording or inscrip-tion required by the text of the law. Story's Equity, § 397, p. 385-399. 6 Mart. N. S. 716. 8 N. S. 140, 246. 8 La. 296.

There can, therefore, be no defence made by the opposing creditors, but that they received the bonds after their issue to others, and that when they re-ceived them they did not know of the prior encumbrances. To this we answer, that you could not have known that the bonds were secured by my mortgage, without looking at the mortgage referred to on the face; and when you saw your security you also saw the previous encumbrances recited.

It cannot surely be urged that because the first and second series of bonds were regularly inscribed at their first issue, that the holders are in a worse condition than if they never had been inscribed; this would be a deductio ad absurdum. If we are safe, as we have proved, without inscription, our having been inscribed ten years cannot injure us. Article 3333 has been quoted to show that after a ten year's inscription, the mortgage becomes a chirographic debt as to the contracting parties. It says: "The registry preserves the evi-dence of mortgages and privileges during ten years, reckoning from their date. Their effect ceases even against the contracting parties, if the inscriptions have not been renewed before the expiration of this time, in the manner in which they were first made." The obscurity produced by the word their is removed by the French text, which reads: "Les inscriptions conservent l'hypothèque et le privilège à compter du jour de leur date; leur effet cesse, même contre les parties contractantes, si ces inscriptions n'ont été renouvellées avant l'expiration de ce delai, de la manière qu'elles ont été prises." The use of the word their was a mere mis-translation, and to retain the word registry, and refer "their" to

*mortgages* and *privileges*, would produce the following consequences: Articles 3314 and 3315 would be wholly annulled after the lapse of ten years. The mortgage or privilege would frequently be extinguished, as between debtor and creditor, and the parties, before the debt itself would become due. The creditor would be punished for his diligence; for if he had never inscribed, articles 3314 and 3315 would have been in force for his benefit. Finally, this loss of all his security is based upon no motives of private good, or public benefit or policy.

It is contended that, the re-inscription was wholly void under art. 3333, which enacts that the mortgage shall be re-inscribed in the same manner as required by art. 3330.

It is true, that our Code requires the production of the act or authentic copy when enregistered, and the same form when re-inscribed ; but this is not a cause of nullity; when being once duly produced and copied,·the register or re-inscription does not mention the production of another copy, but contents himself with referring by page, book, letter, &c. on his register to the original inscription. · "Le defaut de représentation du titre .serait il une cause de nullité ? il faut juger du merite d'une inscription par ce que se trouve relaté sur les registres du conservateur ; or on ne fait pas mention de cette representation sur les registres ? l'inscription ne peut des lors être attaqué pour cette cause." "La representation du titre constitutif n'est donc pas tellement de rigueur, qu'elle ne puisse pas être executée par equipollence."· Boileux, vol. 2; p. 606.

" L'inscription prise sur la representation d'une signification, contenante copie du titre est même valable." Cass. 1833, Sirey 33, 1, 641. 1823, Sirey 23, 1, 64.

"Une inscription n'est pas nulle par le defaut d'ènonciation expresse du títre constitutif de la créance, lorsque ce títre est rapellé dans l'acte en vertu duquel l'inscription est prise, et *si* d'aileurs les tiers peuvent y trouver tout ce qu'ils ont interet de savoir (Cass) 3 février, 1819. Boileux, vol. 2, p. 610. D. 17, 326."

" Une autre difficulté qu'on propose sur la représentation du titre—le créancier, dit-on, est-il obligée à peine de nullité de l'inscription de représenter l'acte en vertu duquel il la requiert? D'une part il semblerait que toutes les formalités étant de rigueur en cette matière, celleci devrait être exactement suivie, mais en y refléchissant on demure convaincu que la représentation du titre *n'est pas une formalité substantielle de l'inscription;* que ce ne pourrait être que par excès de rigueur qu'on pourrait regarder comme un vice radical; en effet, on concoit aisément *qu'un conservateur puisse se refuser à faire l'inscription lorsqu'on ne lui représent pas le titre qui eut fait la base,* mais ce qu'on ne peut imaginer c'est qu'on puisse le regarder comme nulle; des qu'elle est faite, l'inscription une fois existante sur les registres rien n'atteste le représentation du titre, et cependant tout le mode sait, et la cour de cassation la déjà décidé, qu'on ne juge du mérite et de la validité d'une inscription que pour ce qui se trouve relaté sur les registres du conservateur ; or, comme nous l'avons déjà indiqué, la loi n'exige pas qu'on fasse mention de la représentation du titre, et expérience prouve que les registres n'en contiennent jamais la preuve. Ainsi nous tenons que s'il se· trouvait un conservateur assez complaisant pour ne pas exiger la représentation du titre, l'inscription une fois faite n'en serait pas moindre valuable. Persil, Hyp. vol. 2, p, 26.

"Une constitution d'hypothèque et une inscription hypothécaire ne peuvent être annullés, pour ne pas contenir une désignation suffisante de la nature ou espèce de biens hypothèques, si d'ailleurs ces biens sont indiques d'une manière précise, et si les tiers n'ont pu être induits en erreur," &c. Boileux, vol. 2, p. 610.

"Comme le disait M. Daniels dans les conclusions de 1807, &c., l'objet de la loi en traçant les formalités d'inscription a été, de donner des moyens assez efficaces pour empécher que celui qui va preter son argent, ou qui veut acheter un immeuble, ne tombe dans un piège par l'ignorance des charges qui présent sur le debiteur. Ce qu'il y a donc de substantiel dans l'article 2148, *c'est ce qui eclaire le preteur de fonds, ou l'acquéreur sur la position du debiteur;* ce sont les formalités qui étant omises peuvent induire en erreur ceux qui veulent contracter avec ce même debiteur. " Les autres formalités ne sont qu'accidentelles ou prècautionelles, et l'on ne voit pas de raison pour dire que leur omission doit produire une nulité, car cette nulllité n'est ni prononcée par la loi, ni conseillée par l'èquite." Troplong, vol. 3, Hyp. p. 74.

So, in our Code, arts. 3317 and 3330 do not pronounce any nullity upon the non-observance of form. The inscription is good, if sufficient to put others upon their guard, and of course if the re-inscription be made with the same substantial compliance, that is also good, for the re-inscription is not required to be made more perfect than the original inscription. Dalloz, Dic. de Jurisp. vol. 3, p. 123, § 15. "Au surplus ce systeme des equipollens aboutit d'une manière indirecte à faire triompher notre opinion. Nous demandons seulement qu'on l'applique sans restriction," &c. . . . " La cour de cassation a decidé que les erreurs non préjudiciables ne sont pas suffisantes pour annuler l'inscription." 3d Troplong, Hyp. p. 131.

*E. Briggs,* for Phillips. praying for an amendment of the judgment below. *Phillips,* one of the appellants, is owner of a number of the bonds, secured by mortgage, bearing date 15th March, 1834. This mortgage was, on the 26th March, 1834, duly inscribed in the office of the recorder of mortgages of this city, and was re-inscribed on the 21st April, 1845. By the judgment of the court below, the rights of this appellant are made secondary to those of other claimants, on the ground that, at the expiration of ten years following the inscription of his mortgage, its effect, as against third parties, ceased, and was revived only from the date of its re-inscription already referred to; and that the claim of *Leeds & Co.,* creditors under a mortgage recorded on the 29th July, 1840, and of those claiming under the mortgage recorded 14th December, 1841, were entitled to priority. In these two mortgages, as well as in all others granted subsequently to that under which he claims, his mortgage is recognized, it is certified to exist by the recorder of mortgages, and recited as existing by the act under which their rights, as mortgagees, are created. The claimants under the various judgments are all mortgage creditors, holders of bonds or obligations secured by the mortgages of the 15th March, 1834, 15th January, 1836, 20th July, 1840, and 9th December, 1841, and in each of them his mortgage is acknowledged.

It will be conceded that, the only object of inscription is, to give publicity to the charge created by the mortgage or judgment inscribed. "L'inscription est d'après notre article 2134, C. N., l'instrument, le vehicule de la publicité; *mais elle ne fait pas l'hypothèque,* elle la met seulement en action." "L'effet de l'inscription est de determiner le rang des hypothèques *entre* creanciers." Troplong, vol. 2, p. 382, art. cit. no. 466. "Puisque l'inscription n'est requise que pour assurer le rang des hypothèques *entre creanciers,* il suit qu'el n'est requise à l'égard du debiteur. No. 477, Grenier, t. 1, p. 137, §. 66.

Parties to the act, and those who have dealt with the debtor, with notice of the right, or after its existence, cannot take advantage of the noninscription of a mortgage; and, as a corollary, the contracting parties, their heirs, and their witnesses; and consequently, notice as to them is equivalent to registration.

Art. 3333 of our Code is copied from the Code Napoléon, with the exception of the words to which so much force and importance has been attributed; and it is fair to assume that, the framers of our Code were conusant of the construction given to their model by all French jurists. The language of the Code Napoléon refers to the *registration,* and does so necessarily, because, if the lapse of ten years destroyed the *obligation,* re-inscription after that period could not have revived it, which we know it did. The omission derogated from the rank, but did not disturb the *fond de droit.* Rogron, art. cit. Troplong, vol. 3, p. 173, Hypothèques, no. 716, bis. Favard, Inscrip. Hypoth. sec 6. Paillet, Droit Civil, art. cit. Boileux, Com. Hypoth. art. cit.

All French jurists concur that, the limit put to the period through which an original inscription should be valid, was induced by considerations which concerned the convenience of the register alone: "Le motif pour lequel cette péremption a été établie, est, que si on n'eut pas annulé les inscriptions après dix ans, les recherches eussent été herissées d'un grand nombre de difficultés, à raison du laps du temps." Troplong, vol. 3, p. 167, no. 713. Rogron, art. cit. Favard, vol. 3, p. 68. It is clear, therefore, that those who framed the French Code did not intend to apply this article to the extinguishment of the obligation.

The author just quoted, with reference to the mode in which re-inscription should be made, states, that the Code does not specify the form. In no. 715, (vol. 3, p. 169,) he draws a distinction, sustained by the authorities he quotes, between re-inscription by direct reference to the original act, and cases in which

no such reference is made, and says: "Si elle s'y refère, dans ce cas la cour de Cassation a décidé par deux arrêts, l'un du 3 février, 1819, l'autre du 22 février, 1825, qu'il n'etait pas nécessaire que le renouvellement d'inscription fut accompagné de toutes les formalités et énonciations exigées par l'art. 2148. Ainsi est valable l'acte de renouvellement dans lequel le créancier s'est borné à exprimer qu'il entendait renouveller une inscription prise par lui tel jour sur les biens d'un tel, son debiteur, enregistré dans tel, volume et dans tel numero." "Le non renouvellement peut être opposé par les créanciers entre eux et par les tiers acquéreurs, en un mot par tous ceux qui, fondant leur sécureté sur la publicité des hypothèques, ont intérêt à soutenir qu'ils ont eu juste sujet de croire que l'inscription non renouvellée était périmée.   Du reste; la peremption de l'inscription ne fait perdre que *le rang*, et nullement *le fond du droit*, à moins qu'il n'y ait purgement." Ibid, 716, *bis.*

The law, then, is clear, that a re-inscription after ten years would re-establish the mortgage in all its force, subject, however, under the French law, to the rights of all mesne incumbrances, whether with or without notice.

"L'effet de l'inscription dure pendant dix ans, c'est à dire, qu'elle conserve pendant cet espace de temps, dans toute son integrité les privilèges et hypothèques qui y sont énoncés.   Lorsque l'inscription est renouvellée avant l'expiration des dix années, ce renouvellement opère la prorogation de l'effet de l'inscription primitive, et l'hypothèque conserve son rang, à la date de son inscription primitive.   Mais si l'inscription n'est pas renouvellée dans les dix ans, le rang que l'inscription première avait attaché à l'hypothèque, est irrévocablement perdu, et l'inscription qu'on en serait faite postérieurement ne serait plus un renouvellement de l'inscription primitive, mais une nouvelle inscription, qui n'aurait d'effet et ne prendrait rang que du jour de sa date." Favard, vol. 3, p. 65.   Rogron, Pailliet, and Troplong are to the same effect.

The French and Louisiana systems differ in many essential points.   Both require registration; the French Code, in accordance with formalities not required by our laws.   Both require re-inscription at the end of ten years.   The French Code is silent as to the mode in which this is to be effected: our Code requires that it should be done in the mode prescribed for the original registration, which merely exacts the presentation, by the party or his agent, of an authentic copy of the act, without any direction as to the mode in which it is to be recorded.   The French Code gives, as has been shown, preference to the inscribed creditor, however formal may have been the notice he has received of the prior incumbrance: our Code excepts from those entitled to this preference, parties who have received notice of the prior charge.   The French Code admits the effect of re-inscription after the lapse of ten years, subject to mesne incumbrances: our Code, according to the doctrine of our opponents, not only derogates from the rank, but annihilates the *fond de droit*.   Both codes, at the same time, admit that registration, as between the contracting parties, is a useless formality.

Let us see what is the position of the parties under the law, as I understand it.   The bondholders, under the first emission, are secured by a mortgage dated March 15th, 1834, recorded the 26th of the same month.   Those claiming under the second mortgage, of the 15th January, 1836, recorded 30th of the same month, advanced their money and received their security, with full knowledge of the existence of the first.   It is not only set out in the certificate of the recorder of mortgages, but is formally recited in the act of mortgage given to secure the bonds.   The act of mortgage granted to *Leeds & Co.* is accompanied with the same recital; it is the act they signed, and it is to be presumed they read it; and lastly, in the mortgage recorded 14th December, 1846, all these prior incumbrances are as formally deatailed.

Can any doubt exist in the mind of the court that these parties are affected by the doctrine established by 3315th article of the Civil Code?   Can they be classed with persons who have dealt with the debtor in ignorance, or before the existence of the right?   They are, independent of their character of mortgagees, creditors claiming under judgments, based on titles which exhibited and made patent the prior incumbrance, and at the same time their knowledge of its existence; and they ask the court, under the color of a solitary article of the Code, at variance with every principle established by it, and evidently dependent for its force on false translation, unceremoniously to extinguish this incumbrance, and distribute the only means of payment amongst them in liqui-

SHEPHERD
*v.*
ORLEANS
COTTON PRESS
COMPANY.

dation of their subsequent claims, as though it had never been created. They contend that, so positive is the declaration of legislative will, that re-inscription cannot revive the obligation thus extinguished, which I have shown is contrary to the received doctrine in France. The mortgage given to secure the first series was re-inscribed on the 21st April, 1845, and, consequently, prior to the mortgage of 1846; but it avails us not. The *fond de droit* is destroyed, and the obligation, originally to mature at the expiration of twelve years, is dissolved at the end of ten. Can this court sanction a doctrine so monstrous?

But I contend that, in recording each and every mortgage subsequent in date to the first, that that mortgage was re-inscribed, so as to answer all the requirements of the law. It is true that original inscription requires the presentation of the authentic act, or private writing, and re-inscription is to be attended by the like formalities. So does the French law, as regards original inscription. The re-inscription, under this system, has no particular formula; and it is held that, the same formality was not required, as I have before endeavored to show. "*On a demandé si le conservateur des hypothèques peut se refuser à renouveler l'inscription alors qu'on ne lui presente pas le titre originaire. Il faut repondre que non. Car si la loi exige la representation du titre lorsque il s'agit de prendre une première inscription, c'est pour que le conservateur soit pleinement assuré que l'individu qui requiert l'inscription n'est pas sans qualité. Mais lorsque l'hypothèque a été dejà inscrite, il n'a plus les mêmes craintes à avoir. Il ne peut pas douter que la requisition à fin de renouvellement ne soit fondée sur un titre.*" Troplong, vol. 3, Hypoth. no. 716. Favard, Inscrip. Hypoth. sec. 7, no. 7. We have seen that where reference is had to the original inscription, a very slight enumeration of dates, folios, &c. were held to be sufficient. Even under the French law, strict as are the formalities prescribed, the presentation of the authentic act, even on original inscription, is accidental, and not substantive. Boileux, in his commentary on article 2148, C. N., thus expresses himself: "*Le defaut de réprésentation du titre serait il une cause de nullité? Il faut juger du merite d'une inscription, par ce qui se trouve relaté sur les registres du conservateur: or, on ne fait pas mention de cette représentation sur les registres; l'inscription ne peut dès lors être attaqué pour cette cause. Le représentation du titre constitutif, n'est donc pas tellement de rigueur, qu'elle ne puisse être executée pur équipollence.*" Cass. 19 juin, 1833, sec. 33, p. 461. 18 juin, 1823, sec. 2, 3, 1, 64.

Now, what takes place in original inscription? The record presents the name of the notary, the date of the act, the names of the mortgagor and mortgagee, a description of the property mortgaged, the amount secured, and the period at which the payment is to be made. In all the subsequent mortgages these same particulars are given. The act creates the new mortgage, describes the property, and then goes on to declare that it is subject to certain mortgages, &c. Is not this a re-inscription? The requirement of the authentic act for the first inscription is, doubtless, induced by reasoning analogous to that cited from Troplong. Are not the requirements of the article 3333, in spirit complied with, when the re-inscription is affected by the presentation of an authentic act, by one in adverse interest, containing, though in recital, all the elements required in the original mortgage, and all the recorder ever spread upon his pages?

*Lee* and *Durant*, for the appellant Bringier. The re-inscription by *Shepherd* is to be construed, not in accordance with his desires, but according to the legal nature and effect of mortgages. It is true, he desires to secure his own eighty two bonds only, and is indifferent to, or even anxious to sacrifice, the interest of those who are, with him, the joint holders of the series to which his bonds belong; but to effect his purpose, he is compelled to set forth at length the facts and circumstances of the original mortgage; he cites the act by which defendants granted the mortgage, and describes the book and page of the registration thereof in the mortgage office. Now, the original act of mortgage was a unit; there was not a distinct act in favor of *Shepherd*, another in favor of *Phelps, Doge & Co.*, another in favor of *Bringier*, &c., but an act in favor of all the holders of the second series of bonds, which act was, in itself, one and indivisible. That it was so, is seen by art. 3249 of the Civil Code, which says: "The mortgage is a legal right on the property bound for the discharge of the obligation. It is in its nature indivisible," &c. *Shepherd* must be considered as having re-inscribed the whole mortgage, or nothing.

The re-inscription of a mortgage, after the lapse of ten years, produces no effect. Art. 3333 of the Civil Code, says: "The registry preserves the evidence of mortgages and privileges during ten years, reckoning from the day of their date: their effect ceases, *even against the contracting parties*, if the inscriptions have not been renewed *before the expiration of this time*, in the manner in which they were first made."

The mortgage to secure the first series of bonds was *prescribed*, and the attempt to renew it, after the expiration of ten years, was a nullity, and should not have been permitted by the recorder of mortgages.

The case of *Roche's Heirs* v. *Groysilliere* involves the point now under consideration, whether a mortgage is prescribed by the lapse of ten years after inscription without renewal thereof, and whether it is prescribed by the lapse of ten years without inscription. The court say: "As more than ten years elapsed between the promulgation of the Louisiana Code and the intervention of the heirs of Walker in this suit, without the inscription of their mortgage being renewed, we conclude that, the effect of their mortgage has ceased, and that the plea of the third possessor (prescription) is well founded in law.

In the case of *Minor* v. *Alexander*, 6 Robinson, 171, this question was more fully, though not more judiciously, discussed than in the case just quoted, and in the former the court reconciles entirely all apparent conflict between articles 3316 and 3333. The court say: "It is evident that the intention of the lawmaker was, that a mortgage, whether inscribed or not, *should cease to have its legal effect after ten years*, unless *renewed* before the expiration of the time; and that the want of registry should prejudice the contracting parties, as well as third persons, if not made before the expiration of ten years from the date of the mortgage with regard to the parties themselves, or of its first inscription with respect to third persons. From these different provisions of our law, it seems to us that it may be fairly inferred that, although the mortgage need not be originally recorded to have effect between the contracting parties, still, it is required that, in order to continue after ten years to have the effect it had, as to them only, whilst it was not registered, the mortgage should be inscribed as directed in article 3333; and that this second or new inscription may be considered as a renewal of the mortgage between the parties, and against third persons. This interpretation, in our opinion, gives full effect to the two provisions of the law, apparently contradictory, and is subject to less inconvenience in the application than if they were construed in their literal sense. Here, the vendor's mortgage was not re-inscribed until about twelve or thirteen years after the date of the act, and we must conclude that its effect had ceased, even between the contracting parties, at the time of the second registry." The principles of this effective and conclusive decision are revived and re-affirmed in *Lejeune* v. *Hebert*, 6 Robinson, 421.

*F. B. Conrad*, for the appellant, McCawley.

*Hoffman*, contrà. There is no error in the judgment appealed from. It has been contended that art. 3333 is in effect the same as art. 2154 of the French Code. That in the French text the language used, with the addition of a few words, is that used in the French Code, and that the interpretation must be the same.

If the rule laid down in art. 3333, contains no evidence of a different intention, the exception incorporated in it is conclusive proof thereof. It is said that the sole motive for limiting the effect of registering a mortgage to ten years, was to dispense with a search by the register beyond that period. Now the exception to the rule which our law contains entirely defeats that object, inasmuch as it requires a search beyond that period in a numerous class of mortgages. In France as with us, mortgages in favor of minors, &c. have effect against all without being inscribed, but it is made the duty of tutors and others to cause such inscription to be made. In France it is the duty of the same class of persons to cause a re-inscription of all such mortgages; and in case of neglect they are held responsible in the same manner as for a neglect to inscribe. Sirey, 8, 2, 81. It cannot be pretended that such responsibility exists under our law. Having caused the inscription to be made the responsibility of keeping it there rests with the register alone.

The peculiar provision of our legislation, which gives effect to mortgages without inscription, as against those who in bad faith seek to take advantage of the want of it, is that upon which the appellants rest all their hopes. Equally pe-

SHEPHERD    culiar are the provisions in relation to the force and effect of mortgages in cases
    v.      of failure.  Also in the formalities required for inscribing.  Under the Code of
ORLEANS    1808, a mortgage gave precedence over ordinary creditors without registry.  Such
COTTON PRESS was the law in France before the Code, and until settled otherwise by the Court
COMPANY.   of Cassation was, by some commentators, deemed to be law after it.  See Sirey
7, 2, 954, and Delvincourt, vol. 2, page 648.  Our jurists were also well aware
that the mortgage produced certain effects, as between the parties to the con-
tract, without being recorded ; such as the right to an order of seizure and sale,
the right to be paid out of the property mortgaged, thereby depriving the deb-
tor of the right of pointing out property.  It is therefore evident that in fixing
a period for the prescription of mortgages, terms were purposely used which
extended its application to the effect of the contract as between the parties.
This is in conformity with the construction given by the late Supreme Court in
13 La. 245, 14 La. 102, 6 Rob. 166, 419.

Let us now examine the provision peculiar to the Code, that notice of the
existence of a mortgage is equivalent to registry.

Article 3297 will be found verbatim the same with that of the French Code :
" Among creditors the mortgage has force only from the time of recording it in
the manner hereinafter directed."  Then follows the exceptions in favor of
minors, &c.  At the beginning of the next section we find what is called the
limitation of that rule.  Arts. 3314, 3315.  It is contended that all the appel-
lants come within the exception to the rule.  Arts. 3316, 3320 and 3329 contain
similar provisions, and a just rule of interpretation requires that they be taken
in connexion with the two former.

The court is called upon to decide upon the rights of mortgage creditors in a
case where all the parties have duly registered their mortgages, and in which
some of them omitted to re-inscribe within the period fixed by law.  The ap-
pellants, by the registry of their mortgages, affected all the world with notice
of their existence, and thus precluded all questions that otherwise might have
arisen, under the state of things contemplated by arts. 3214, 3215.  The case
argued by the opposite counsel is one in which the *registry* of the mortgage had
been omitted, and the rights claimed by subsequent mortgagees are contested
on the ground that, at the time of becoming such, they were aware of the ex-
istence of the prior mortgage.  The record calls for no decision upon such a
state of facts.  The important distinction between the two cases, consists in
the fact that the mortgages in question were duly *inscribed*, and that being the
case, the only question for decision is, what alteration, if any, took place, as to
the rights of the parties, by the failure of some of them to *renew* such registry
within ten years.  To meet this view of the case, the appellants are bound to
show that they are in the same condition they would have been in, had they
omitted to inscribe their mortgages.  To prove this, they must show that the
registry of a mortgage produces no legal effects.  The legal effects resulting
from registry, is to visit with notice as effectually as if all the world had wit-
nessed the contract.  C. C. art. 2264.  The inscription gave rights to the
mortgagee, which he had not without it.  It placed all others under restrictions
which did not exist without it.  If then the registry produced certain effects
and operated a change in the condition of the mortgagees, can it be maintained
that the failure to reinscribe, wiped away all the legal consequences which at-
tached to the registry ?  I answer, no.  Many instances may be put where the
legal consequences of a step taken by a creditor cannot be got rid of.

The claim of a mortgage creditor who has taken no note is not prescribed
under ten years.  But should he take a note from his debtor his claim will be
limited to five years from its maturity.  Could he, by destroying the note, after
the period, take from creditors the legal effects resulting from his act ?

We conclude then that the appellants by inscribing their mortgages shut out
all questions that might otherwise have arisen under articles 3214, 3215.  That
by doing so they brought themselves within the very letter of art. 3333, accord-
ing to their own interpretation of it, and that the legal consequences resulting
from the failure to reinscribe, must have effect.

*Preston,* on the same side.  No point has been more fully decided in every
possible form by the Supreme Court, than that a mortgage inscribed more than
10 years, without re-inscription, ceases to exist between the parties and third
persons.  *Roche's Heirs* v. *Groysilliére,* 13 La. 245.  *Gravier* v. *Hodge,* 14
La. 103.  *Dupuy* vs. *Dashiel,* 6 Robinson, 166, 419.  11 La. 66.  There

would be no confidence in judicial decision, nor security for property, nor certainty in transactions, if the question were still open.

Not only have the actions of men, but legislative action has been governed by the uniform judicial decision upon art. 3333 of the Code. In 1842 the legislature, by express law, exempted the property of banks from the effect of that article, which they conceived about to extinguish the mortgages in favor of those banks; and, in 1843, authorized any person interested to cause to be cancelled mortgages more than ten years old. The only possible reason was, that they were *extinct* by the operation of law. Otherwise, the legislature would not have authorized any one to injure a mortgagee by cancelling his existing mortgage, not only for his own benefit but as to all other persons. Acts of 1842. p. 232. Acts of 1843, p. 51.

Registry alone gives effect to a mortgage. Civil Code, arts. 3317, 3318, 3290, 8 Mart. N. S. 570. 9 La. 354. As to the date, see art. 3319. To obtain a registry, the creditor or his agent must present an authentic copy of the act to be recorded to the register of mortgages. Civil Code, article 3330. It has effect against third persons only from the day it is thus registered. Civil Code, arts. 3317, 3318, 3319. And to have effect after ten years, it must be *reinscribed* in the same manner. Art. 3333. The registry of an act of mortgage containing the recital of the mortgages in an annexed certificate, is not a registry of those mortgages. It has never been so understood by the community, nor by recorders of mortgages, who never give a correspondent certificate. Such a principle would produce unutterable confusion in the mortgage offices. If such a recital in the certificate, or act of sale, or mortgage, were regarded as a sufficient registry, or notice of the mortgages, to the subsequent vendee or mortgagee, article 3333 of the Code would be in opperative, because in all sales, mortgages, or donations, the notary is bound by article 3328 to obtain a certificate of all *existing mortgages*. Article 3333 can have no meaning if such notice supersedes it.

A mortgage is not a debt, but a security for a debt. It is not an obligation, but an accessary to an obligation. It is an encumbrance upon property until a debt is paid. It is the will of the legislature that, that incumbrance should exist, as to third persons, only by being recorded in the mortgage office. It is the will of the legislature that it should cease to exist, at the end of ten years after the inscription. What ceases to exist? The accessary to a debt—the security for that debt—the incumbrance upon property. Suppose the property in other hands than those of the mortgagor, would it be pretended that his knowledge that the debt was not paid would keep alive the accessary obligation. Articles 3314, 3315 are not inconsistent with 3333, as interpreted by us. They relate to inscription, not re-inscription. They are limited to the parties, their heirs and witnesses. They protect the negligent from those who seek to take advantage of their knowledge of that negligence; not those, who in their fair business, oppose an extinguished mortgage.

The mortgage is prescribed. Article 3374, nos. 4, and 6, and art. 3333 of the Civil Code establish the only prescription in cases of mortgages. Prescription is a peremptory exception founded in law. Code of Practice, art. 345. Every party interested is entitled to plead it. Civil Code, art. 3429. Good faith is not required to support prescription. Ibid. art. 3515. It results from the mere silence or inaction of the obligee. Civil Code, art. 3494. It releases property from every real right. Art. 3495. The third possessor may plead that the mortgage has not been registered. Civil Code, art. 3366.

As to a mortgage not prescribed, the court can give full effect to articles 3214, 3215. They do not relate to mortgages which have been prescribed.

*T. A. Clarke, Benjamin* and *Micou*, on the same side.

*Josephs, Bradford, Roselius, Burthe, C. M. Jones* and *Grymes*, for different appellees.

The judgment of the court was pronounced by

ROST, J.[*]  The object of this controversy is to ascertain the order in which the mortgage creditors of the Orleans Cotton Press Company are to be paid, out of the proceeds of the sale of the establishment where the Company carried on its operations. The following are the mortgages to be classed; 1st. A mort-

---

[*] SLIDELL, J., did not sit in this case, being related to one of the parties.

SHEPHERD
*v.*
ORLEANS
COTTON PRESS
COMPANY.

gage to secure the payment of four hundred bonds of $500 each, and one hundred and twenty bonds of $400 each, all bearing date the 15th of March, 1834. This mortgage was inscribed on the 26th of March, 1834, and no re-inscription of it took place till the 21st of April, 1845. 2d. A mortgage given to secure the payment of one hundred and twenty bonds of $500 each, bearing date the 15th of January, 1836, and recorded on the 30th of the same month. An attempt was made by one of the bond-holders, on the 13th of January, 1846, to re-inscribe that mortgage, so far as his interest went. 3d. A mortgage in favor of *Leeds & Co.*, inscribed on the 29th of July, 1845. 4th. A mortgage given to secure the payment of eighty bonds of the Company, for $500 each, inscribed on the 14th of December, 1841. This mortgage has been reduced by payments to $13 500, besides interest. 5th. A judgment obtained by *Rezin D. Shepherd* against the Orleans Cotton Press Company, inscribed on the 3d of February, 1846.

The judge of the court below, following the jurisprudence established by the late Supreme Court, and considering, that the mortgage given in 1834 lost its rank and ceased to have effect even against third persons having notice, on the 29th of March, 1844, for want of re-inscription—that the re-inscription made on the 21st of April, 1845, had, from that day, and from that day only, the effect of a new mortgage—that, although against all persons not coming under the denomination of third persons, the mortgage may exist whether recorded or not, the inscribed mortgage ceases to have effect against all persons, if more than ten years have been suffered to elapse without re-inscription—that the attempt at re-inscribing the mortgage of 1836 was not in a legal form, and could produce no effect, ordered the proceeds of the sales to be distributed as follows: 1st. To pay and satisfy the costs of the suit in which the property was seized and sold, including the costs of this suit. 2d. To discharge the mortgage of *Leeds & Co.* 3d. To discharge the mortgage recorded on 14th of December, 1841, by satisfying the bonds yet unpaid, which it was intended to secure, and the interest due thereon. 4th. To discharge the mortgage re-inscribed on the 21st of April, 1845, by satisfying the bonds yet unpaid, which it was intended to secure, with interest due thereon. 5th. To pay and satisfy the principal, interest, and costs of the suit of *R. D. Shepherd* against the Orleans Cotton Press Company. The court further ordered the erasure upon the books of the recorder, of all the other mortgages mentioned in his certificate. Three of the creditors have appealed from this judgment, and upon the appeal several others have asked that it be amended.

For a proper understanding of the points made by the numerous counsel, it is necessary to premise that, in countries where the civil and common law prevail, the registry laws are at this day administered upon two distint and essentially different principles. In the first, so far as all but the parties are concerned, the inscription is in fact the mortgage. It must be renewed at certain fixed periods, and the non-re-inscription may be opposed by all third persons having an adverse interest, although they may be charged with notice. The right of preference which subsequent mortgage creditors, with or without notice, are compelled by law to to give the inscribed mortgage, provided it is re-inscribed according to law, appears to be viewed there in the light of an obligation contracted on condition that an event shall happen within a limited time. C. C. art. 2033. The case of *Turner* v. *Parker*. 10 Rob. 154.

The delay is in all cases fatal, and if it is suffered to expire without re-inscription, the mortgage loses its rank, and a subsequent re-inscription gives it

effect only from the time it is made. A litigation between the mortgage creditors   SHEPHERD
does not dispense from re-inscription ; even the sale of the property effected un-      *v.*
der the mortgages, not does dispense from it, when the purchaser fails to pay the  ORLEANS
price. The inscription must continue until the proceeds of the property mort-  COTTON PRESS
gaged are reduced to possession. 2 Troplong, Priv. et Hyp. nos. 558, 569, 570.  COMPANY.
3 Troplong, nos. 716, 716 *bis*, 770, 724, 725. Merlin, Rep. de Jurisp., *verbis* In-
scription and Hypothèque. Such is the principle of the registry law of France,
and of the other nations of Europe who have imitated her Codes.

In England and in the other states of the Union, the rule, on the contrary,
is that inscription need not be renewed, that the want of the registry required
by the statute is not in all cases fatal; and that extra-judicial notice, when
brought home to the party who alleges the want of registry, is equipollent to it.
Story's Equity, pp. 397, 385, 399.

We are called upon to determine upon which of these two principles the
registry laws of Louisiana have been framed, and should be administered. The
appellees contend that, by the introduction in the Louisiana Code of art. 3333,
which is the same as art. 2154 of the Napoléon Code, enlarged so as to extend
the effect of non-re-inscription to the parties themselves, we have adopted
the rule of the French law in a manner too clear to be misunderstood; that
whatever may be the intendment of arts. 3314 and 3315 of the Civil Code, the
question involved in this controversy is not one of unregistered mortgages, and
that, whenever the inscription has been made, the provisions of art. 3333
cannot be evaded. They further allege that art. 3328 makes it the duty of
every notary, who passes an act of sale, mortgage or donation of an immovable,
to obtain from the office of mortgages a certificate declaring the privileges or
mortgages inscribed on the object of the contract and to mention them in the
act, and that, as it is also made the duty of notaries to see to the first inscrip-
tion of those acts, the presumption is that that incumbrances upon immovable
property are always inscribed and known to the persons dealing with the owner:
that consequently, if all persons having such a notice are deprived of the rights
intended to be conferred by art. 3333, that article is in all cases in operation.

The appellants, on the other hand, insist that, under arts. 3314 and 3315 of
our Code, which are not found in the French Code, the contending parties
here cannot be called third persons, because they did not become creditors be-
fore the existence of the previous mortgages, and did not deal with the debtor in
ignorance of those mortgages, since they had them reiterated to them in the acts
under which they claim ; that, if inscription was required as to them, those two
articles would become inoperative, and the diligent creditor, who inscribes his
mortgage, would find himself placed in a worse condition than if he had not
inscribed it.

The most universal and effectual way of discovering the true meaning of laws,
when their provisions appear conflicting, is by considering their reason and
spirit, and the motives which induced the legislature to enact them. Civil Code,
art. 18. Under the laws of Louisiana, at the time of the change of government,
both immovables and moveables were subject to a great number of mortgages,
and no publicity was required to be given to them. It was soon perceived that
such a state of things was ill adapted to the necessities of a growing and com-
mercial country, and the inconvenience and occasional hardship resulting from
it, soon raised against the whole system of mortgages an opposition which has
controlled all our subsequent legislation in relation to them. As early as the

SHEPHERD adoption of the Code of 1808, it succeded in abolishing mortgages on moveables,
v.
ORLEANS and in establishing a recording office in the city of New Orleans, where all con-
COTTON PRESS ventional and judicial mortgages were to be inscribed, before they could have
COMPANY. effect against third persons; but it was unable, at that time to subject legal mort-
gages to that formality. They continued to have effect without inscription, and
the framers of the Code adopted, on the subject of good faith and of notice, dis-
positions similar to those of arts. 3314 and 3315 of the present Civil Code. See
Code of 1808, p. 458, art. 37; p. 470, art. 78; p. 472, art. 80; p. 464, arts. 52,
53, 54. In 1810 recording offices were established in every parish in the terri-
tory. 3 Martin's Digest, *verbo* Mortgage. The opposition continued to gain
strength, and, in 1813, an act was passed making it necessary to record all
mortgages and liens, under a penalty which is in these words: "And all sure-
ties, sales, contracts, judgments, sentences or decrees, and all liens of any nature
whatever, having the effect of legal mortgage, which shall not be recorded
agreeably to the provisions of these acts, *shall be utterly null and void to all
intents and purposes*, except between the parties thereto." The 3rd section of
that act provided that, the want of the formality of recording should in no wise
be prejudicial to the interests of minors, absent heirs and persons insane. These
were the only exceptions.

The spirit that dictated that act presided over the formation of the Code of 1825.
Many of the legal mortgages were abolished by it, and art. 3333 was evidently a
blow aimed at those that were suffered to remain. It has been considered by
the legislature ever since as suffering no exception. In 1842, the property banks
were exempted by law from its operation, under the belief that it was about to
extinguish the right of preference of the mortgages held by those institutions.
In 1843, any persons having an interest were authorized, by another law, to cause
to be cancelled on the books of the recorder all mortgages the inscription of
which had continued more than ten years. Acts of 1842, p. 232,   Acts of
1843, p. 61.

After these repeated manifestations of the *mens legislatoris*, and the nume-
rous adjudications of our courts giving it effect, the question must be considered
as settled. Nothing has been shown in argument that would justify this court
in disturbing at this late day a known rule of property. A similar state of
things in France, at the beginning of the revolution, produced there, also, a
violent opposition to occult mortgages. That opposition resulted in the adop-
tion of the principle of publicity, and of the specific legislation which we have
borrowed from them.

Questions about uninscribed mortgages under arts. 3314 and 3315 will be de-
termined as they come before us; but it may here be observed that those
articles were taken from dispositions of the Code of 1808, and that the new
dispositions introduced along with them, have the effect of rendering them, to
a very great extent, inoperative.

Registry laws, provided they are known and certain, can work no injury.
The view which has been heretofore taken of ours, and which we feel con-
strained to adopt, has, in a high degree, the merit of certainty in its application,
and is consonant with the general rule of the civil law, that legal delays are
fatal in all cases, unless expressly declared to be otherwise. It is based upon
the consideration that, whatever may be the effect of the notice generally,
when the act has been inscribed they do not extend to a waiver of the laws
which regulate the mode and limit the life of the inscription. The inscription

is exclusively in the power of the party having an interest to make it. If he
does not reinscribe, he cannot complain of losses sustained through his own
neglect. The construction contended for by the appellants would make, in all
cases, of the effect of instription, a matter *en pais*, and therefore uncertain,
and would give rise to endless litigation.

SHEPHERD
*v*
ORLEANS
COTTON PRESS
COMPANY.

We do not understand art. 3333 as providing for the prescription of mort-
gages, but, on the contrary, as recognizing the right of re-inscription, after
the expiration of ten years, as exercised by the first mortgagees in this case.

The French side of that article clearly expresses the intention of the legis-
lature. It is the effect of the inscription that ceases, not the effect of the
mortgage. If the prescription of the mortgage had been intended, it would
have been so expressed. Prescription never attaches by implication.

The cases in the 13th and 14th vols. of the Louisiana Reports should be
understood as having reference to the inscription, although, it must be ad-
mitted, that the language used by the court would authorize a different in-
terpretation. *Roche's Heirs* vs. *Groysilliére*, 13th La. 245. *Gravier's Ex-
ecutors* vs. *Hodge*, 14 La. 103.

The inscription produces some effects between the contracting parties.
Art. 3329 provides that, if a person who has given a mortgage on his pro-
perty, takes advantage of the neglect to register the mortgage, and engages
the same property afterwards to another person, without informing him of
the first mortgage, he shall be considered guilty of fraud, and shall be sub-
ject to the damages which the law authorizes in such cases. After the in-
scription, he is not liable in damages for giving a second mortgage. At the
expiration of ten years, if no re-inscription takes place, his liability revives,
and in that manner, the effect of the first inscription ceases, even *against
the contracting parties*.

The court below did not err in considering the re-inscription attempted
to be made on the 13th of January, 1846, for part of the mortgage secur-
ing the second series of bonds, as void. Whatever be the form of the re-
inscription, the description of the property mortgaged is one of its essential
requisites, and was entirely omitted on that occasion. The reference to pre-
vious mortgages does not cure that defect. The object of the re-inscrip-
tion is to dispense from searching, for the evidence of mortgages, more than
ten years back.

That part of the judgment appealed from which orders the amount of a
judgment obtained by *R. D. Shepherd* against the defendants, in suit No.
24478 of the District Court, to be paid by preference, is erroneous. That
judgment was obtained upon bonds of the second series, and, as the effect
of the mortgage securing the payment of those bonds did not cease between
the parties to it, by the omission to re-inscribe after ten years, all the bonds
of that series should be paid concurrently.

It is therefore ordered that the judgment of the District Court be amend-
ed, so that, after satisfying the four previous mortgages, the balance remain-
ing be distributed *pro rata* between R. D. Shepherd and all the other
holders of the bonds of the defendants, bearing date the 15th of January,
1836. It is further ordered, that the judgment thus amended be affirmed,
the appellee R. D. Shepherd paying one half of the costs of the appeal,
the other half to be paid by the appellants.